Halsted, Chancellor.
On the 24th of February, 1849, the legislature of New Jersey passed an act entitled “ An act to incorporate the Newark Plank Road and Ferry Company.” By the eighth section of this act, the said company are authorized to survey, lay out, and construct a plank road, to commence in the city of Newark, east of Broad street, and thence passing by the most convenient and direct course to the bank of the Passaic river, near the old ferry, and across the meadow between said Passaic and Hackensack rivers, and through the county of Hudson, in the most eligible route, to its point of termination in said county and opposite the city of New York; and the said section further provides that it shall be lawful for the said company at any time to drive piles and erect or build piers, wharves, platforms, ferry stairs, or other works necessary for the said road and ferries thereon, in the said Passaic and Hackensack rivers; provided always, that the free and uninterrupted navigation of vessels in said rivers or either of them is not thereby prevented by any bridge or other obstruction in- said rivers, in any manner whatever.
The eleventh section of the said act provides that the said company shall keep and maintain not less than two good and *757 sufficient ferry-boats, propelled or moved by steam, horsepower or otherwise, for the safe transportation of horses, carriages, passengers, goods and other commodities, one boat on each of the said rivers, at the respective ferries, and persons capable of managing the said boats; and the said company shall cause to be put a lamp at the extreme point of each pier at said ferries, which said lamps shall be lighted every evening, before dark, and continue lighted until daylight next morning.
The bill prays an injunction restraining the said company from projecting piers, wharves, &c., into the Passaic river, on either side thereof, and from obstructing, by any works at the ferry across the Passaic, the free and uninterrupted navigation of the said river.
The company have already driven piles in the river, on each side thereof, to some distance from the banks ; and have thereby indicated the distance to which they intend to project piers into the river. The bill claims that the company have no right to extend piers into the river to the distance so indicated, nor to obstruct the navigation of the river at all, by any works extending beyond its banks.
The act contemplates and provides for a ferry across the river by means of a steamboat, and such a ferry as will be safe for the transportation of horses, carriages, passengers, goods, &c., and provides that the company may drive piles and erect or build piers, wharves, platforms or other works necessary for the said ferry. The Passaic river, at low water, leaves margins of earth bare between its banks and low water mark. This must be presumed to have been known by the legislature, as also must the manner in which steamboats are used for ferries.
I think it clear that the act gives the company the right to extend their works beyond the banks of the river; and that the position taken by the complainant that any, the least extension beyond the bank, is prohibited by the proviso to the eighth section of the act, is not maintainable. The proviso is, not that the river shall not be at all obstructed, but that the free and uninterrupted navigation of vessels *758 in the river shall not be prevented by any bridge or other obstruction. The language of the proviso assumes that the works authorized will be an obstruction to the river, but provides that no such obstruction shall be built or erected as would prevent the free and uninterrupted navigation of vessels in the river.
I think the true construction of the act is that the company are authorized by it to build their wharves or piers in the river to such extent only that a ferry-boat of suitable dimensions may reach such wharves or piers at low water, •and such other works, beyond the ends of the wharves or piers, as may be necessary for safely receiving their ferryboat and holding it at the ends of the piers for the safe and •convenient entering upon and leaving said boat. That it was the intention of the legislature that the river should be ferried, by a steamboat or other boat, as far as fairly practicable.
I am of opinion that the plan of the company mentioned in the information and bill and in the answer of the defendants, upon which the company propose to construct their wharves, piers and other works in and over parts of said river, and upon which they were proceeding to construct the same at the time of the filing of the bill and information, extends into the river to the obstruction of the navigation of vessels therein beyond what is necessary for the purposes aforesaid, and beyond what is contemplated by the act of incorporation.
An injunction will, thei’efore, be allowed, restraining the defendants from constructing their works in and upon the said river upon the plan above mentioned, and from extending their piers or wharves into the said river beyond a point on each side thereof which may be reached by a ferry-boat of suitable dimensions at low water.
On the fourth day of August an injunction issued. On the tenth of November notice was given to the defendants of an application to the Chancellor that an attachment issue against the defendants for a contempt in violating said *759 order. Chancellor Halsted, by whom the injunction was ordered, having retired from office, and Chancellor Williamson, his successor, having been concerned as counsel in the case, the Hon. Henry W. Green, Chief Justice of the Supreme Court, was called to the assistance of the Chancellor. The history of the proceedings in the cause are clearly stated in the opinion.
Green, C. J. The bill and information filed in this cause on the eighteenth of June, 1851, charges that the defendants, the Newark Plank Road and Ferry. Company, and others, are engaged, without lawful authority, in contravention of their charter, in the erection of a ferry and piers in the navigable waters of the Passaic river, to the injury and obstruction of navigation. The prayer of the bill is that the defendants may be restrained from carrying into effect the plan devised and determined upon for erecting their ferry and piers at and across said river, and from constructing and erecting said piers into and upon said river, according to said plan, as they are engaged in doing, and from driving any piles, or erecting or building any piers, bulkheads, platforms, ferry stairs, or other works, in or upon the said river, whereby the free and uninterrupted navigation of said river may be in any wise obstructed, or the free navigation of said river by vessels, in any manner prevented, and from driving any piles, or building or erecting any piers, platforms or other works in or upon said river, other than such as are authorized by their acts of incorporation, and also from making any obstructions or erections whatsoever in said river, where the waters thereof are navigable; and that the nuisance and obstruction to the navigation of the Passaic river already created by driving piles, thereby may, by the order or decree of this court, be abated.
The defendants, by their answer, admit that they have determined to construct a ferry across the Passaic river, and that they are engaged in erecting piers extending out into the river, according to a plan particularly set out in the answer, but they deny that the contemplated erections are in *760 violation of the charter of said company, or that they will obstruct or impede the navigation of said river in any material manner, or that it will at all prevent the free and uninterrupted navigation of said river, with ordinary care.
By the plan specified in the answer, and represented on a drawing thereto annexed, it appears that the river, at the point where the ferry is constructed, is five hundred and eighty-five feet from low water mark on the west side to low water mark on the east side; that the defendants have driven piles for their piers, extending into the river beyond low water mark, about one hundred and ten feet on the west side, and about forty feet on the east side of the river; that said piles are driven in rows parallel to the bank of the river, the rows being twenty feet apart; and that by the plan the defendants propose to extend from the row of piles furthest in the river on the west side, two rows of piles as fenders to the ferry-boat, to extend about fifty-seven feet towards the centre of the river; to add an additional row of piles to the piers on the east side of the river, adding twenty feet to its length, and to extend two rows of piles, as fenders, from the extremity of the pier towards the centre of the river, so that the piers and fenders shall extend one hundred and twenty feet into the river beyond low water mark, thus occupying within the piers and fenders two hundred and eighty-seven feet of the entire width of the river, and leaving a space of three hundred feet between the extremities of the fenders for the passage of vessels.
, Upon the coming in of the answer, the complainants moved for an injunction, pursuant to the prayer of the bill. The cause having been heard before the Chancellor upon the bill, answer and affidavits of the respective parties, and the Chancellor being of opinion “ that the charter or act of incorporation of the Newark Plank Road and Ferry Company authorizes said company to build their wharves or piers in the Passaic river to such an extent only as to enable ferryboats of the company, of suitable dimensions, to reach such wharves or piers at low water, and such other works beyond the ends of the wharves or piers as may be necessary for *761 safely receiving their ferry boats and holding them at the ends of the piers, for the safe and convenient passage across said ferry, (if any such other works be necessary), that it was the intention of the legislature that the river should be ferried by steamboats or other boats, and that it is to be ferried accordingly, as far as fairly practicable.
And the Chancellor being further of opinion that the plan of the company mentioned in the information and bill, and in the answer of the defendants, by which the said company propose to construct their wharves, piers, and other works, in and upon said river, and upon which they were proceeding to construct the same at the time of filing the information and bill, extends into the river, to the obstructing of the navigation of vessels therein, beyond what is necessary for the purpose aforesaid, and beyond what is contemplated or authorized by the charter or act of incorporation of said company, on the 21st of July, 1851, did order that an injunction issue, restraining the defendants from, constructing their works in and upon the Passaic river upon the place in said bill and answer mentioned, or in the manner in said answer set forth, and also from, extending their piers or wharves into said river beyond points on each side thereof, which may be reached by ferry-boats of the company, of suitable dimensions, at low water. On the fourth day of August, an injunction issued accordingly, and was duly served upon the company. On the tenth of November notice was given to the defendants of an application to the Chancellor than an attachment issue against the defendants for a contempt in violating said order and injunction in this, that they have erected their piers and other works further into the navigable waters of the Passaic river thereof than by the said order and injunction is permitted or allowed, and contrary to the said order and injunction, and also in this that they have continued and have not removed the said obstructions erected by them previous to said order and writ of injunction, which were contrary to law and said order, but have made and are proceeding to make the same permanent. Notice was also given that an application would be made at the same *762 time to refer it to one of the masters of the court or to some .suitable person or persons, to ascertain and report to the court the manner in which said piers or wharves and other works of said company should be erected, in order to conform to the direction contained in said order and decree and writ of injunction, the notice not having been heard at the time designated, and the Chancellor by whom the injunction was ordered having retired from office, notice was given that the application would be received on the sixth of April last, and that at the same time an application would be made to the Chancellor for an order directing so much of the said piers and wharves and other works of the' said company as are contrary to or in violation of said order and injunction to be abated and removed.
The cause was brought to hearing upon the foregoing notice on the tenth of July last.
This somewhat minute detail of proceedings in the cause is deemed essential to a proper understanding of the question presented, and a proper apprehension of the relative positions and rights of the respective parties.
The present application is for three distinct and independent orders, viz.:
First. For an attachment for contempt in violating the order and injunction of the court.
Second. For a reference to some suitable person to ascertain and report to the court the manner in which the piers, wharves, and other works shall be erected, in order to conform to the directions contained in the order and- writ of injunction heretofore made and issued in the cause; and
Third. For an order directing so much of the said piers, wharves, and other works of said company as are contrary to or in violation of said order and injunction, to be abated and removed.
They will be considered in the order in which they are stated.
Are the defendants in contempt for violating the order and injunction of the court?
By the order and injunction of the court, the defendant *763 are enjoined from conducting their works upon the Passaic river in the manner in their answer set forth, and also from extending their piers or wharves into the river beyond points on each side thereof, which may be reached by ferryboats of the company, of suitable dimensions, at low water.
It is material to observe by way of elucidation, that connected with the order for an injunction and embodied within the order and injunction, the Chancellor has declared his opinion that, the charter or act of incorporation of the Newark Plank Road and Ferry Company authorized said company to build their wharves or piers in the Passaic river to such an extent as to enable ferry boats of the company, of suitable dimensions, to reach such wharves or piers at low water, and such other works beyond the ends of the wharves or piers as may be necessary for safely receiving their ferryboats and holding them at the ends of the piers, for the safe and convenient passage across the said ferry, (if any such other works be necessary,) and also that it was the intention of the legislature that the river should be ferried by steamboats or other boats, and that it is to be ferried accordingly, as far as is fa.irly practicable.
By this injunction the defendants are restrained first from constructing their works in the manner set forth in the answer. By the evidence of Edward Carter, the engineer of the plank road company, it appears that the plan upon which the works upon the Passaic were finally constructed, varied from the plan set forth in the answer in two particulars, viz.: First. The row of piles designed to be added to the piers on the east side of the river was not driven, and one row of piles at the extremity of each pier has been taken up, and a floating bridge or platform has been substituted for the immovable pier. Second. The piers with their wings have been shortened, so that the clear space between the pilings for the passage of vessels has been extended from three hundred to three hundred and fifty feet. The mere change from a fixed pier to a floating platform occupying the same space, cannot be regarded as any essential change of plan. The objection in the mind of the Chancellor to the *764 plan set forth in the answer was, that it projected farther into the river than was warranted by the charter, to the obstruction of navigation. The change of the pier for the float in nowise relieved the objection or essentially altered the plan in its obnoxious feature; the injury to navigation still remained the same. But the shortening of the piers, thereby diminishing the obstruction to navigation, and widening the channel fifty feet, is an essential modification of the plan set forth in the answer, and relieves it to some extent, at least, of its objectionable character. It cannot be said that the works are constructed in the manner set forth in the answer, nor in the manner substantially the same, so far as its injurious effects upon the navigation of the river are concerned. Upon this point the defendants have committed no violation of the injunction.
The defendants were further enjoined from extending' their piers or wharves into the river beyond points on each side thereof which may be reached by ferry-boats of suitable dimensions, at low water.
A material question upon this part of the ease is, What is a ferry-boat of suitable dimensions for this ferry, and what would be the draft of water? A number of witnesses on the part of the complainants, some of them men of experience as ferry-men and pilots, practically skilled in the management of ferry-boats, testify that the draught of a boat of suitable dimensions for this ferry will not exceed three feet. They vary in their estimate of a proper draught, from two and a half to three feet. A single witness on the part of the defendants, (Selah Hill,) a boat builder, has expressed the opinion that the depth of water required for a boat which would be convenient for this ferry, would be five and a half to six feet. The weight of evidence founded on the opinion of witnesses is very decided that the draught of a boat of suitable dimensions would not exceed three feet. Yet this evidence is certainly not of the most conclusive or satisfactory character. It rests mainly on speculative opinion. Not one of the witnesses alleges that he has ever seen a ferry-boat of that draught of water, or that he has ever seen *765 a ferry-boat of any description in operation upon a ferry across a stream of the width of channel and rapidity of current of the Passaic river at the plank road ferry. There is no ferry in operation across the Passaic between Belleville and the bay, or within the flow of tide-water. The boats used by the witnesses who are ferrymen, are used in deeper and broader streams, and have a greater draught of water. Their opinions are little better than mere theoretical speculations. Nor should it be lost sight of that the defendants themselves originally provided boats for this ferry-drawing only two feet of water ; they were abandoned as utterly inadequate to the purpose, and a boat drawing from four and a half to five feet of water was procured. At the time the evidence closed, this boat had not commenced running, and it was not then known whether it would or would not prove successful; at least there is no evidence upon this point. In considering the question whether this is a boat of suitable dimensions, some weight must be attached to the fact that the boat has been procured by the company, to be run upon the ferry after boats of a lighter draught and of a ■different construction had been tried and abandoned. It must be assumed, upon this investigation, lha't the company, in so doing, acted in good faith for the interest of the stockholders, with the design of procuring a boat of suitable dimensions for practicability, and not with the sinister purpose of transcending their chartered powers, or evading the injunction by creating a fancied necessity for unduly extending their piers and obstructing the free navigation of the river. When the evidence in this cause closed, no experiment had been made of the efficiency of the vessel, or its suitableness to the purposes of the ferry. The experiment, it may be presumed, has not been made ; at any rate, the question is eminently a practical question — one that can be satisfactorily settled only by practical experience, aided by scientific skill. By these means it is a question susceptible of ready and satisfactory solution, and there can be no necessity or propriety in attempting to settle it upon the strength of mere speculation or theoretical opinions ; nor would it be *766 safe or proper to visit the defendants with penal inflictions,, except upon the clearest and most satisfactory evidence that the boats which they have procured are unsuitable for the purposes for which they are designed. Without designing to express any opinion, whatever, upon the abstract question what would be the draft of water of a boat of suitable dimensions for this ferry, T think it proper to assume at this stage of the cause, and. for the purpose of this hearing, that the boat of the company drawing four and a half to five feet, is, in accordance with the Chancellor’s opinion, a boat of suitable dimensions to be used upon this ferry. The inquiry remains, are the piers or wharves of the company extended into the river beyond points on either side which may be reached by boats drawing five feet of water by measurement made on the part of the complainants on the 22d of November last, at low water, as the witness testifies the depth of water at the extremity of the pier on the west side of the-river was six feet four inches at the first row of piles; ten feet from the extremity of the pier, the depth was seven feet six inches; at the second row of piles, twenty feet nearer shore, the depth was seven feet four inches; at the third row of piles, six feet, and at the fourth row, seventy feet from the extremity of the pier, the depth was four feet. These measurements are on the north side of the pier; the depths of water on the south side are slightly variant, but not so as to materially affect the result. By measurements made at the same time, it appears that the depth of water between the extremities of the wings, about sixty feet in a straight line from the end of the pier towards the centre of the river, is six feet eight inches.
By measurements made on the part of the defendants on .various days, from the eighteenth of November to the ninth of December, 1851, the depth of water immediately in front of the piers on the west side of the river varied from four-feet nine inches to six feet one inch; at the first row of piles, ten feet from the extremity of the pier, the depth varied from five feet to seven feet three inches; at the second row of piles, thirty feet from the extremity of the *767 pier, the depth varied from seven feet three inches to seven feet eight inches ; at the third row of piles, fifty feet from the extremity of the pier, the depth varied from four feet eight inches to six feet, and at the fourth row of piles, seventy feet from the extremity of the pier, the depth varied from two feet one inch to three feet ten inches. The variations in these measurements, all professing to be made at dead low water, may no doubt be accounted for in a great measure, by the variations in the tides. It appears by the evidence of Aaron M. King, the book-keeper of the company, by whom the measurements on the part of the defendants were principally made, that at two of his measurements the tides were lower than he had ever- seen them before, and that he made the measurements on those days because the tides were so low. These measurements, however, while they vary as to the depth of water at different days and different hours of the same day, all concur in showing that the water at the first and second row of piles is deeper than at the extremity of the pier; that at the third row of piles it is but two or three inches less, and that no material diminution in the depth of water is shown until reaching the fourth row of piles, a distance of seventy feet -from the extremity of the pier. This shoaling of the water probably occurs gradually between the third and fourth row of piles, that is, at the distance of from fifty to seventy feet from the extremity of the pier. The evidence further shows that the depth of water from thirty to fifty feet between the extremity of the pier and the shore, is greater than it is for the same distance from the extremity of the pier to the centre of the river. Upon this point there is no conflict nor contradiction in the testimony. The evidence upon both sides concurs.
We have, then, the fact as established and uncontradicted, that the depth of water is as great from the present extremity of the western pier to a distance of fifty feet nearer shore, as it is at the extremity of the pier, and that a boat of a given draught of water may reach a pier or float at least fifty feet nearer the shore, with as great facility as it does at the present termination of the pier.
*768 Admitting, then, that the boat of' the company drawing five feet of water is of suitable dimensions, it is obvious that it could reach a pier at least fifty feet nearer shore with the same facility that' it reaches the present terminus of the pier. This extension of the pier is the more remarkable from the fact that at the time of filing the answer when the work was projected and partly accomplished, the boats procured and designed to be used by the company drew only two feet of water. With boats of that draught there would seem to be no difficulty in approaching much nearer the shore on both sides of the river; in this aspect of the case, the piers seem to have been constructed without the least reference to the depth of water necessary for the draught of the boats. I have looked carefully through the evidence to ascertain what necessity led to so great an extension of the piers, but without success. It cannot have arisen from the necessity of having a greater depth of water under the boat to render her manageable, for the evidence clearly shows that a boat lying fifty feet nearer the western shore, will float in deeper water than in her berth at the extremity of the present pier. Nor can it have arisen from any supposed necessity for shortening the ferry, for all the evidence agrees that in the tide-way where the current is strong, boats driven by paddle-wheels are more manageable in a long ferry than in a short one. The answer explicitly states that the design of the company at that time was to use-boats driven with paddle-wheels, and not with an endless chain. And although the paddle-wheels have been abandoned and an endless chain substituted, there is no allegation or pretence in the evidence that the addition of fifty to one hundred feet to the length of the ferry would prevent or impede the operations of the ferry with its present equipments.
In considering the evidence, the fact has not been lost sight of that piers with the swings as finally constructed, occupy fifty feet less of the channel of the river than they did upon the plan set forth in the answer. But notwithstanding this change of plan, I find nothing in the evidence to induce the belief that the termination of the floating bridge *769 on the west side of the river, is any nearer the shore than was indicated by the original plan ; all the evidence, as well as the line of argument adopted by counsel, warrant the conclusion that the termination of the western pier is not materially different from what it was at the time of the measurements made by the agents of both parties on the twenty-second of November, 1851.
The conclusion is unavoidable that the order and injunction of the court have been violated in this, that the defendants have not refrained from extending their piers or wharves into the river beyond points on each side thereof, which may be reached by ferry-boats of the company, of suitable dimensions, at low water.
1. It has been said that there was no necessity apparent from the evidence why the piers should have been originally constructed to extend into the river so far beyond the limit indicated by the order and injunction of the court. Evidence has been offered, however, as facts, though not operating at the original projection and construction of the piers, to justify its continuance in its present extent. The effect of this evidence remains to be considered.
It appears that as the' plank road was originally constructed, its termini on both sides of the Passaic river were contiguous or very near the termini of the Morris canal. That on the west side of the river the terminus was south of the terminus of the canal; while on the east side of the river the terminus of the road was north of the terminus of the canal; as a necessary consequence, the track of the ferryboats, in crossing the river, intersected the track of the canal boats, so that the boats seriously interfered with each other in their transit, and the canal boats were further obstructed by being carried by the tides against the piles of the piers of the road. As a consequence of these difficulties, the plank road company were compelled or induced, at the instance of the canal company, to change the route of the canal so that its termini, on both sides of the river, should be south of the termini of the road; this change was effected by carrying the canal under the road or platform of the pier *770 at the second row of piling from its western extremity; the platform at that point was of necessity raised to admit the passage of the canal. It is further shown, in evidence, that as the work is now constructed, the terminus of the western pier cannot be brought nearer the shore. 1st. Because, in consequence of the construction of the canal, the float cannot be brought nearer the shore; and, 2d. Because the elevation of the platform over the canal would render the descent from that point to the extremity of the pier too' steep for convenient access to the boat. These facts are proved by a single witness, examined on the twenty-second of April, after the case had been set down for argument. This is, however, no contradictory evidence, and the facts thus stated will be taken as satisfactorily proven. Assuming the facts as fully proved, it is clear that they had no existence and were not within the contemplation of the defendants when the work was originally planned or constructed, nor when the application for an attachment was originally made. It is not perceived how, in any aspect of the case, they can justify the defendents in violating the injunction, or purge the contempt when actually incurred. But waiving this preliminary objection, the evidence does not show any satisfactory reason for the existence of the state of facts which creates the supposed necessity for an exsension of the pier.
It does not appear that by proper precautions on the part of. the defendants in the original construction of the road, the whole difficulty might not readily have been avoided, nor does it appear but that, in effecting the recent alteration, the course of the canal might have been changed and carried under the road at a point more remote from the river, and thus the whole difficulty have been effectually relieved. Indeed, from the evidence, it appears affirmatively that it was a mere question of dollars and cents of expense to the defendants whether the course of the canal should have been diverted at a point more remote from the river. Under such circumstances, the defendants certainly cannot rely upon their own carelessness or mistakes, or regard to mere *771 economy in expenditure, to justify a violation of the order and injunction of the court, and an encroachment upon the waters of a navigable river.
It was further insisted, on the part of the defendants, that at the point of the river where the ferry is located, owing to the straightness of the river and width and the depth of the channel, the navigation is better than at any other point between Newark and the bar at the mouth of the river, and that the piers, leaving an unobstructed passage of three hundred and fifty feet, present no obstruction or injury whatever to navigation. This is a point upon which the evidence is conflicting, and upon which this court is not authorized to express an opinion. It, is not an open question. The Chancellor’s opinion is the only test by which the legality of the defendants’ operations are now to be tested. He has settled that the works of the defendants are not to be projected into the river beyond points which may be reached by sniláble boats. That any encroachment upon the river beyond either of these points, is an obstruction to navigation in violation of the charter, and a contempt of the order and injunction of the court.
I am of opinion that the work is constructed in violation of the order and injunction of the court, and that no fact or circumstance has been shown which can justify the violation or relieve the defendants from the penalties of a contempt. It has already been said that this court cannot, with the evidence before it, with any propriety, settle the construction or necessary draught of water of boats of suitable dimensions to be used on the ferry. Consequently, no opinion can be formed or expressed upon the extent to which the piers or wharves of the company may, under the opinion of the Chancellor, be extended into the river. There are other points, affecting the question at issue between these parties, in regard to which there is much conflict of opinion among the witnesses, and upon which the court, upon the evidence before it, is not warranted in expressing an opinion. These are: the depth of water necessary to float a ferry-boat of a given draught, so that the boat shall remain entirely manage *772 able; the effect of the running of a ferry-boat and of the tides and currents of the river in deepening or filling up the channel at the ends of the piers. These are questions which observation and practical experiment alone can satisfactorily determine. In order that the defendants may be fully protected in the enjoyment of their corporate franchises, and the complainants and the public secured in the enjoyment of all their rights in the navigable waters of the Passaic, it is necessary that these questions should be examined and satisfactorily settled. To grant an attachment against the defendants and hold them liable to the penalties of a contempt of the order and injunction of the court before their rights under that order are clearly and definitely settled, can lead to no beneficial result or final adjustment of the difficulty. It is important, therefore, for the interests of all parties, that these questions be settled before proceeding against the defendants for the penalties of a contempt, and to this end I am of opinion that it should be referred to one of the masters of the court, or to other suitable person or persons, to ascertain and report to this court the depth of water necessary to float boats of suitable dimensions to be used at said ferry; the distance to which the piers on each side of the river should extend into the river for the proper accommodation of such boats; the necessity, if any there be, for the use of pilings as fenders for boats propelled by an endless chain, and the necessary extent of such fenders, and the manner in which the piers, wharves and other works of the plank road company should be erected, in order to conform to the opinion of the Chancellor, and to the order and injunction of the court.
It was objected, upon the argument, that no order of reference, for the purpose contemplated, can now be made by the court; that such order should have been made by the Chancellor upon the application, and if bis decision was not satisfactory, redress must be had by appeal. No authority was cited to support the position, and I know of no principle upon which it can be sustained. The Chancellor was asked for an injunction to prevent a nuisance in the waters of a *773 navigable rivpr, and he granted it, giving, at the same time, his opinion most clearly as to the extent of the defen dents’ rights. The court at that time not having sufficient information to give more specific direction as to the manner in which the works of the company should be constructed, necessarily left it to the judgment of the company, subject to the provisions of their charier, and the directions contained in the order of the court. The Chancellor, it is now apparent, acted with great wisdom in not attempting at that stage of the work to give specific directions respecting its proper execution, or even referring it to an officer of the court to make report respecting it.
The operations of the company show clearly that aside from the unavoidable delay incident to such a measure, the step would have proved in the highest degree disastrous to their interests, with all the practical and scientific skill it may be presumed they have brought to the execution of their work; many of their operations have been mere experiments, and those experiments have proved failures. They tried horse-power, but abandoned it for steam. They tried ferry-boats with two feet draught of water, and supplied their place with boats of a draught of five feet. They tried boats propelled by paddle wheels, but have adopted an endless chain as a substitute. They drove fixed pilings to the very ends of their piers, but have supplied their places by floating platforms. These experiments, we presume, were made in good faith, with the aid of all the lights which experience and skill could furnish. It is clear that any report made by a master, and any conclusion adopted by the court, might, at that period, have proved equally erroneous, and far more disastrous to the interests of the defendants. The Chancellor, at that time, wisely declined to interfere. But no such difficulty exists at present. It may safely be inferred that with the experience of the company, a safe and satisfactory conclusion upon the points in question may without difficulty be arrived at.
It is further objected that it is to be inferred from the language of the order that the Chancellor did not design to *774 enforce obedience to the injunction by attachment, nor to abate any part of the work actually erected, but to leave the defendants to be proceeded against by indictment for a nuisance in case of a violation of their charter or of the order of the court. But it is clear that the injunction would be a nugatory and idle process unless the court’lend its aid to enforce its mandate. Whether the court will hereafter enforce obedience to its mandate and a compliance with its directions solely by process for contempt, or whether it will order so much of the works of the company as are erected, in violation of the decree and injunction of the court to be abated, is unnecessary now to inquire.
It is clear that the court have not at present the necessary information, if the order were otherwise, proper to enable it to decide how far the works of the company have been erected in violation of the injunction, nor, consequently, how far they ought to be abated.
I do therefore respectfully advise his Honor, the Chancellor, that the defendants have violated the order and injunction of the court, and that an attachment issue against them for contempt. But, inasmuch as it does not satisfactorily appear by the evidence before the court to what extent the injunction has been violated, nor how far the works of the oompany would require to be altered to conform to the order and injunction of the conrt, I do further respectfully advise his Honor, the Chancellor, that before an attachment issue against the defendants for contempt, it be referred to one of the masters of the court or other suitable person or persons, to ascertain and report to the court, with all convenient speed, the manner in which the piers, wharves, and other works of the said company should be constructed in order to conform, to the order and injunction of the court, and that the said master do particularly report the depth of water necessary to float boats of suitable dimensions to be used at such ferry, the proper construction and draught of such boats, the distance to which the piers should extend into the river upon each side for the proper accommodation of such boats, and whether wings or fenders projecting be *775 yond the ends of the piers are necessary for boats propelled by an endless chain, and the proper extent of such wings. And I do further respectfully advise his Honor, the Chancellor, that the application for an order to abate any part of the works of the defendants ought, in the present state of the cause, to be denied.
REPORT OF MASTERS.
In pursuance of an order in this cause, made by the Chancellor, bearing date the sixteenth day of November, in the year of our Lord one thousand eight hundred and fifty-two, whereby it was referred to the subscribers, as masters of said court, to ascertain and report the manner in which the piers, wharves, and other works of the Newark Plank Road and Ferry Company, on the Passaic river, should be constructed, in order to conform to the prior order and injunction of the said court, and particularly report the depth of water necessary to float boats of suitable dimensions to be used at said ferry, the proper construction and draught of such boats, the distance to which the piers or wharves should extend into said river upon each side, in order to enable ferry-boats of suitable dimensions to reach the same at low water, and whether wings or fenders beyond the ends of the piers or wharves are necessary for boats propelled by an endless chain, and if the same are necessary, the proper extent of such wings or fenders—
We, Joseph P. Bradley, Ashbel Welch and Aaron Robertson, do hereby certify and report to the Chancellor:
That we have visited and inspected the ferry and premises of the defendants referred to in the said order, and the boat now used on said ferry, and have witnessed the operation thereof, and have also taken the depositions of divers witnesses produced before us by the parties' upon due notice given, and also of witnesses called by ourselves at our own instance, which depositions we hereby return to the court with this our report; and the counsel for the complainants also produced before us the pleadings in this cause, and the *776 depositions, proofs, and exhibits heretofore taken therein ; one of which exhibits, being a map of the premises, exhibiting-the general position of the said ferry, and the soundings of the said river at ordinary low water, is hereto annexed for the purpose of reference in this our report. And we have ascertained and do report that the ferry-boat now used by said company on the said ferry, is, in length, eighty-one feet on deck, and seventy feet on the keel; in width, thirty-seven feet on deck, thirty feet beam under the guards, and twenty-four feet at the bottom ; and the depth, seven feet between planks. Her bottom is flat, and her draught when light, (that is, with nothing but her engines, boiler, apparatus, fuel, &c., on board,) is two feet and six inches; her draught when loaded to the extent she is liable to be loaded, is three feet and six inches. Her section at the water line, when light, being about seventeen hundred superficial feet, and increasing as she settles, it would require nearly fifty tons to increase her draught one foot; and fifty tons is more than equal to the weight of ten double-horse teams, with wagons loaded, which is as large a load as the boat can well carry. This boat is propelled by a chain fastened on each pier or wharf, and passing through the boat and around drums worked by steam engines, with two of which the boat is provided. The boat is held from drifting too far sideways by two additional chains passing through pulleys, one chain under each guard.
And we do further report that we are satisfied from the observations and from the experience of the said company, attested by the evidence before us, that the said boat, in its construction, draught and apparatus, is the most useful and convenient boat that can be worked on the said ferry.
And we do accordingly ascertain and report that the said boat so above described, is a boat of suitable dimensions and of proper construction and draught to be used at the said ferry.
And we do further certify and report that in our opinion, in view of the depressions of -the tide to which the Passaic river is subject, and of the commotions caused by vessels *777 navigating the same, five feet of water, at ordinary low tide, is necessary to float a boat of such suitable dimensions as aforesaid, in order to give to the said company the fair use of the said ferry, and that such depth is sufficient for that purpose.
And we do further certify and report that to enable ferryboats of suitable dimensions, as aforesaid, to reach the piers, wharves, or floating bridges of said ferry, (such boats having a projection at each end of five feet on deck, beyond the bottom thereof,) the said piers, wharves, or floating bridges should extend into said river, upon each side of said river, to within five feet of the point nearest to the shore, at which the water is live feet deep at ordinary low water; and that, to this end, the pier, wharf, or floating bridge on the east side of said river should extend into said river, as if now is, seventy-seven feet from the shore, and row of piles there situated, the position of the lino of the shore being designated on the map hereunto annexed, by a large dot, marked A, and the position of the said point to which said pier, wharf) or floating bridge should extend, being designated by the dotted lines, marked B. And the pier, wharf, or floating bridge on the west side of said river should extend into said river, as it now is, seventy-two feet from the shore, or sixty-four feet from the first row of piles now standing below high water mark; the position of the line of the shore being designated on the said map by a large dot marked C, and the position of the said point to which said pier, wharf, or floating bridge should extend, being designated by the dotted line marked I).
And we do further certify and report that, in our opinion, wings or fenders, beyond the ends of the piers,- wharves, or floating bridges, are necessary for a boat propelled by a chain in the manner above described, or, as it is expressed, “ by an endless chain,” and that the proper extent of such' wings or fenders, for the said ferry, and with a boat of the dimensions aforesaid, is eighty feet in length from the end of the piers, wharves, or floating bridges, as hereinbefore fixed; extending out towards the centre of the river on each side ,of the *778 boat, (when in her berth,) so that the outward ends of said wings may be about seventy-five feet apart; and have suitable inclinations for guiding the boat in entering, and sufficient length with parallel sides to hold the boat steady when at the wharf or floating bridge, and that the said wings and the said piers, wharves, or bridges should be planked down to the level of low water.
And we do further certify that the piers, wharves, and works of the said company in said river should be constructed in the manner above specified in order to conform to the former order and injunction of the court in this cause above mentioned.
All which is respectfully submitted. Dated Newark, February 14th, 1853.
Joseph P. Bradley,
Ashbel Welch,
Aaron Eobertson.
EXCEPTIONS TO MASTERS’ REPORT.
Exceptions taken by the Newark Plank Eoad and Ferry Company and each and every the defendants in the above Stated suit, to the report of Joseph P. Bradley, Ashbel Welch and Aaron Eobertson, made in this cause and dated February the 14th, A. D. 1853.
First exception. For that it appears by the bill of complaint filed in this cause, and by the decree of the Chancellor made thereon, and by the said report, that the said report relates to matters about which by the said bill no report is prayed, and about which the said decree is silent.
Second exception. That the said report relates to matters about which the defendants were entitled to the benefit of their own answer, and the said report was made without the defendants having any opportunity first to make their answer in relation thereto.
Third exception. For that it appears by the order refer-, ring the matters therein stated to the said' Joseph P. Bradley, Ashbel Welch, and Aaron Eobertson, that the boat, in *779 relation to the use of which their inquiries were thereby directed, was a boat propelled, as it is expressed, by an endless chain ; and it appears by the depositions, exhibits and proofs in the said report referred to, that such a boat cannot be used without floats being fixed and adjusted under a movable bridge at the end of each pier, which may rise and fall with the tide, and so the said bridge be made to accommodate itself with the elevation and depression of the said ferry-boats, and the said Joseph P. Bradley, Ashbel Welch and Aaron Robestson have in their report made no provision whatever for the use of such floats, and no allowance of water therefor, and made no report in relation thereto.
Fourth exception. For that the order referring the matter to the said Joseph P. Bradley, Ashbel Welch and Aaron Robertson, directed therein to report how far the said piers should extend to enable boats of suitable dimensions to reach the same at low water, and it appears by the depositions, exhibits and proofs referred to in said report, that the water sometimes fell so low that the boats in said report approved would be aground and unable to be used.
Fifth exception. For that while the said report states that the waters in said river are subject to commotions caused by vessels (other than the ferry-boat) navigating the same, which affect the said ferry-boats and render more water necessary than would otherwise be requisite, the depositions, exhibits and proofs show that at the points fixed by the said report as the extreme limit of said piers, the ferry-boats would be so affected by the said commotions that the said boats would be much incommoded and injured thereby.
Sixth exception. For that the order of the court, dated November the 16th, A. D. 1852, referred to in said report, refers the matter therein contained, to Joseph P. Bradley, Ashbel Welch and Aaron Robertson, as masters of this court, the said Ashbel Welch and Aaron Robertson being by the same order appointed for this purpose to the office of masters of this court, with all the powers and authority of the masters of this court, and that the laws of the State of New Jersey and the rules of this court require, and the said. *780 order contemplated, that the said Welch’and Robertson, before entering upon any of the duties of a master or examiner of this court, should take certain oaths by the said laws and rules made requisite and essential to be first taken ; and that neither the said Welch nor the said Robertson had at any time before nor since the said appointment taken any of such oaths, and were consequently unauthorized and not empowered to discharge any of the duties of masters of this court, and had no authority to make any report to this court under the directions of said order.
Seventh exception. For that it appears as well by the inspection of the depositions in the said report referred to, as by the statement of the said report, that the said Joseph P. Bradley, Ashbel Welch and Aaron Robertson pretended to act as masters of this court, and as such to take depositions and evidence, on which the said report states that the said report is founded, and did together pretend as masters of this court to administer the oaths to witnesses, and together to sign the jurat to said depositions, and yet neither the said Welch nor the said Robertson had at any time, as masters of this court, the right to administer an oath or take a deposition.
Eighth exception. For that the said order of the 16th of November, A. D. 1852, refers the matter therein stated to the said Joseph P. Bradley, Ashbel Welch and Aaron Robertson, as masters of this court, as is truly stated in said report, and it is only as such masters duly qualified according to law by virtue of their office, that under the said order the said Joseph P. Bradley, Ashbel Welch and Aaron Robertson were authorized to make an investigation, or that their report can be received by this honorable court, and yet not only were the said Welch and Robertson never qualified to act as masters, but although the said order declares that they were appointed for that express purpose, neither they nor the said Joseph P. Bradley make their report as masters of this court.
Ninth exception. For that the said report is in other re *781 spects erroneous, and is contrary to law and evidence, and has many errors and inaccuracies therein.
In all which respects the said exceptants do except to the said masters’ report, and respectfully appeal therefrom to the judgment of this honorable court.
David A. Hayes,

Sol. and of Counsel with Defendants.

On motion to set aside the report of Joseph P. Bradley, Ashbel Welch and Aaron Robertson, Esq’rs.
Green, C. J. The first and second exceptions are that the report relates to matters not within the relief prayed by the bill and granted by the decree; and in relation to which the defendants have had no opportunity to answer.
It is not alleged that the report relates to matters not submitted to the masters for their examination, nor that they have in anywise exceeded the powers conferred upon them by the order of this court. The report, as to its subject matter, is strictly in accordance with the order of reference.
If there be anything in the exceptions, the objections should have been urged against the order, rather than the report. If the order is proper, the exceptions are groundless.
But aside from this preliminary objection, the exceptions cannot prevail, because the matters contained in the report are strictly within the scope of the bill and decree. The bill seeks to enjoin a work which the defendants were engaged in constructing, upon the ground that it would create a nuisance in the navigable waters of the Passaic river. The prayer of the bill is that the defendants may be restrained—
1. From constructing their work upon the plan adopted by them.
2. From constructing any piers or other works in or upon the Passaic, whereby the free navigation of the river may be in anywise obstructed.
*782 3. From erecting any piers or other works in or upon the Passaic, other than such as are authorized by the charter of the Newark Plank Road and Ferry Company. And,
4. That the nuisance and obstruction already created by the defendants, by driving piles in the river'for the erection' of a pier, may be abated.
The bill denies the right of the defendants to erect piers in the Passaic upon the plan proposed, or any piers whatever,, alleging that any pier erected in the navigable waters of the river will create a nuisance.
The defendants, by their answer, admit that they are engaged in constructing the work complained of. They set forth specifically the plan upon which the work is proposed to be constructed, and the distance which the piers will extend into the river; and allege that it will create no nuisance or obstruction to navigation. They claim the right,, under their charter, to erect piers in the river, and insist that they may lawfully do so to the full extent proposed in their plan.
Upon these pleadings the Chancellor declared his opinion to be that the defendants have the right under their charter to construct piers in the river to such point on each side thereof, and to such extent only as to enable ferry-boats of suitable dimensions to reach such piers at low water; but that it was not necessary or lawful that piers or other works should be extended into the river as far as was proposed by the plan of the defendants. An injunction was accordingly issued.
It was subsequently decreed by this court that the defendants, in the prosecution of their work, had extended their piers into the river further than was authorized by their charter, in violation of the injunction of the Chancellor. To determine satisfactorily the point to which the piers may be extended into the river by the defendants under their charter,, and in conformity with the opinion of the Chancellor, was the object of the reference. All the matters contained in the order of reference and in the report, are involved in this one inquiry, or are auxiliary to it. The inquiry is directly *783 within the scope and prayer of the bill, and within the issue made by the pleadings, whether the defendants may lawfully erect piers in the Passaic river, and if yea, to what extent, are the issues made by the bill and answer.
The third, fourth and fifth exceptions relate to errors and inaeouracies in the subject matter of the report. On a careful examination of the report and of the evidence, I find no such errors as are alleged. The masters have furnished the information sought by the order of the court, and their views are fully sustained by the evidence.
The fourth exception is, that it appears by the report that, in extraordinarily low tides, which may occur at long intervals, there will not be sufficient water at the points designated for the termination of the piers, to float a boat of suitable dimensions to be used at the ferry. The same observation may be applied with truth to a great majority of ferries located upon tide waters. It is to the regular and ordinary, and not to the occasional and extraordinary flow and ebb of tide, that the opinion of the Chancellor manifestly refers. To affirm that there must be sufficient depth of water for the ordinary use of the ferry at the lowest neap tide, acted upon by winds of extraordinary violence, would bo equivalent to affirming that the ferry could have no existence. The masters have taken the only proper and just view of the question. The sixth exception is, that two of the persons by whom the report is made were not sworn as masters, as required by law and by the rule of this court, and had, therefore, no authority to make a report. By the order of reference, it is “referred to Joseph P. Bradley, Esq., one of the masters of this court, and to Ashbel Welch and Aaron Robertson, Esqs., who are hereby and for this purpose appointed masters of this court, with all the power and authority of masters of this court,” to ascertain and report, for the information of the court, certain matters of fa (it therein specified. Masters in chancery are not within the provisions of the statute requiring certain officers appointed under the autho-
*784 rity of the state to take an oath of office. The obligation upon masters to be sworn, is imposed by the rule of the Court of Chancery. The master may be sworn before the clerk of the court, an officer not authorized by the statute to administer oaths. The form of official oath taken by the master varies in its terms from that prescribed by the statute. The failure to take the oath, therefore, is a violation, not of the statute, but of the rule of court.
Jt may well be .doubted whether the failure to take the oath, in the present instance, is a violation of the rule. The individuals- named were designated as masters for a special purpose, viz., to ascertain and report certain matters of fact submitted to them in this case. They were not regular or permanent officers of the court. Upon the performance of a special duty, their functions ceased. They had no power to take acknowledgment of deeds, to administer oaths, unless in this case, or to perform any of the duties of masters in chancery, except the special service delegated. They could not, with propriety, have taken the oath prescribed by the rule, to “perform all the duties of the office .of-master in chancery.” They were not masters in chancery, in the ordinary and strict sense of the term. And the true inquiry would seem to be, whether a master may legitimately be appointed for a special purpose; and if not,.then, whether a reference may be made to persons, not masters, to ascertain and report, in conjunction with a master, matters of fact for the information of the court.
It is unnecessary, for the purposes of this case, to decide these questions; for, admitting the irregularity to exist to its utmost extent, it can afford no ground for setting aside this report.- The object of the reference was not to obtain a judicial decision of any question, but merely to inform the conscience of the court upon certain questions of fact. These questions had been submitted to the determination of the court, upon evidence taken in the cause. The court might regularly have decided the case upon that evidence. But the questions being of a nature which rendered a personal examination of the premises, by persons possessed of *785 practical and scientific skill, highly desirable, if not absolutely necessary, they were referred to persons possessing such qualifications, for their examination and report. It was believed that their investigations would lead to a more satisfactory result than either the direct and immediate action of the court, an examination and report by a master, or a trial by jury.
In regard to verdicts of juries upon disputed questions of fact, .the rule in equity is well settled. The judge who directs the issue may act upon it, determine against it, or direct a new trial at his discretion. He may disregard the misdirection of the judge, and the erroneous admission or rejection of evidence upon the trial, and may, notwithstanding the most apparent irregularities of this kind, refuse a new (rial, provided he is satisfied, from the evidence as it exists, and from the record in equity, that the means of forming a correct judgment are before him. Hubback on Ev. of Sue., 56 ; 1 Green’s Chan., 512, and oases cited.
This principle is properly applicable to the present inquiry. The object of the reference has been fully attained. The facts in question have been investigated and ascertained, to the satisfaction of the court, after careful inquiry and personal examination, by individuals eminently qualified for the service, who were selected and appointed with the approbation of- both parties. Under these circumstances, if the report should be set aside for illegalities or informalities, there would be no propriety in a new reference, or further investigation of the facts. The court being satisfied, its decision must be in accordance with the result of the investigation already made. The objection affects neither the merits of the inquiry nor the propriety of the result.
These considerations apply with equal force to the seventh and eighth exceptions.
I do, therefore, respectfully advise his Honor, the Chancellor, that the exceptions be overruled.
Dated January 20th, 1854.
Erom that part of the decree overruling the exceptions to *786 the masters’ report, and confirming and making it absolute; and that orders the attachment to issue against the defendants, and that orders the wharves, &c., abated, and that orders the defendant to pay the complainants’ costs and charges, the defendants appeal to this court.
Mr. Frelinghuysen, for appellants.
Mr. Whitehead, for respondents.
The opinion of the Court of Appeals was delivered by
Elmer, J. The bill in this case was filed June 18th, 1851, and thereupon an order was made that the defendants show cause why an injunction should not issue, and that in the meantime they refrain from prosecuting the contemplated work. The defendants put in their answer, and affidavits were read on both sides. On the seventeenth day of July, the Chancellor having heard the parties, ordered an injunction. Subsequently, an application was made for an attachment and for an order of reference to a master. Upon the hearing of these applications, November 16th, 1852, it was adjudged that the defendants had violated the order and injunction of the court, and that an attachment should issue against them for a contempt; but inasmuch as it did not satisfactorily appear by the evidence before the court, to what extent the injunction had been violated, nor how far the works of the company would require to be altered, to conform to the order and injunction, it was ordered that it be referred to a master of the court, and to two other persons, specially appointed for that purpose, to ascertain and report to the court the manner in which the works of the company should be constructed, and other matters connected with such construction. The masters made their report February 14th, 1853, to which exceptions were put ín, and the case being heard, a decree was made February 9th, 1854, confirming the report of the masters, and that the attachment before ordered, be issued, and that so much of' the piers, *787 wharves, floating bridges, and works of the company, as in the report and decree were mentioned, and stated to have been erected contrary to and in violation of the aforesaid order and injunction, be abated.
From these three several orders or decrees, the defendants took separate appeals, May 15th, 1854; and the first question to be settled by this court is, whether the appeals from the two first orders have been taken in time. This depends upon the question whether either of them was a final decree, within the meaning of the act, which requires that all appeals, except from final decrees, shall be made within forty days piler the order or decree appealed from. 11. 8. 921, § 80.
Neither of those decrees disposed of the whole merits of the case, but left important questions for further examination and the future judgment of the court. They were, therefore, not final decrees. Mills v. Hoag, 7 Paige 18; 2 Dan. Ch. P. 1199, notes and eases there referred to. The appeals not having been made within forty days, must therefore be dismissed, with costs.
It is, however, manifest that the appeal on the final decree, made February 9th, 1854, really involves the merits of the whole case; and this was not disputed by the counsel of the respondents. The first question, then, which arises is, whether the preliminary decree, made November 16th, 1852, was correct. It is objected that it* is erroneous, upon the grounds that it was essential to the jurisdiction of the court, that the works contemplated by the company and complained ofj would be a nuisance; and that the Chancellor did not decide this question, but simply decided that the company was not authorized by their charter to construct their works upon the contemplated plan; and that his construction of the charter was wrong.
Without deeming it necessary to examine the cases cited in reference to the jurisdiction of the court, and admitting, for the purposes of this cause, that the counsel of the appellants are right, and the sole ground upon which the court could interfere was, that the contemplated plan would create a nuisance, I am of opinion that the decree does virtually *788 decide this question, and decides it correctly. The charter authorizes the company to drive piles and erect' certain works in the Passaic river, necessary for their road and ferry, provided that- the free and uninterrupted navigation of vessels in said river, was not thereby prevented by any bridge or other obstruction in said river, in any manner whatever. On the part of the complainants it was urged that this proviso prohibited any bridge or other obstruction in the river, and that the company could not erect any works within the banks of the river. The Chancellor held that this position was not correct, and that the proviso assumes that the works authorized would be an obstruction to the river, but provides that no such obstruction should be erected as would prevent the free and uninterrupted navigation of the river. He further held that the true construction of the act is, that the company are authorized by it to build their wharves and piers in the river to such extent only that a ferry-boat of suitable dimensions may reach such wharves or piers as may be necessary for safely receiving their ferryboat and‘holding it at the ends of the piers, for the safe and convenient entering upon and leaving said boat. And being of opinion that the plan of the company extended into the river, to the obstruction of the navigation of vessels therein, beyond what was necessary for the purposes aforesaid, and beyond what was contemplated by the act of incorporation, he ordered an injunction accordingly.
If the contemplated plan would occasion an obstruction to the navigation of the river beyond what the charter authorized, as he expressly decided, the works would be a nuisance. Every wharf, pier, or bridge is not necessarily a nuisance, because instead of injuring, it might in some cases benefit the navigation; but every erection in a navigable river, which obstructs or hinders the navigation, is a nuisance, for the fact that it does obstruct or hinder the free navigation to which the public is entitled, is precisely what makes it a nuisance, “ ad commune nocumentum.”
Whether the court was correct in deciding that the company had a right to put some obstruction in the river, so *789 that they did not go beyond what he deemed to be authorized by the act, is not before us, the complainants not having appealed. The distinction drawn by the Chancellor between works that would be an obstruction to the river, and such an obstruction as would prevent the free and uninterrupted navigation of vessels in the river, seems to me somewhat difficult to comprehend. But whether this distinction can or cannot be fairly made, I am clear in the opinion that he extended the rights of the company quite as far as the charter will justify, and therefore committed no error of which they can complain. Upon the facts disclosed, the works contemplated in the plan adopted would have, to some extent, obstructed the navigation, and would have prevented the free and uninterrupted navigation of vessels, giving to those words of the proviso the most favorable interpretation the company could properly claim. It is well settled that grants of this nature are to be construed strictly. To extend the meaning of the proviso, so as to authorize any kind or degree of interruption to the navigation beyond what was reasonably necessary for the purposes of such a ferry as the act contemplated, would be to construe the grant with the utmost laxity. I cannot assent to the argument of the defendant’s counsel that, if the company left a passage through which vessels might ordinarily pass in safety, analogous to the draws in certain bridges over the same stream, they would not prevent the navigation of vessels in any manner contemplated by the proviso. A ferry is altogether different from a bridge. The latter can seldom, if ever, be erected over a stream navigable for sailing vessels of any considerable size, without, to some extent, hindering the navigation. The laws authorizing them generally prescribe such draws as will prevent them from doing so to any great extent. Without legislative authority, no one has a right to do this to any extent; and where a law authorizes an obstruction without defining the precise nature of it, it must be restrained to what is reasonably necessary to effect the purpose intended.
A vessel navigating a river, has a right to the unobstruct *790 ed use of all its natural width ; and if that width be unnecessarily diminished, so as to impede the navigation at all times, by night and by day, at high water or low water, in fair weather or in foul, the structure which occasions the injury is a nuisance. It does not necessarily follow that every wharf or pier, or even every bridge does this ; but that the contemplated piers would have had that effect, I think was very manifest upon the facts disclosed by the bill, answer and proofs.
When a case of this kind is presented, it is in the discretion of the court whether it will act upon the facts before it, or require the question of nuisance to be passed upon by a jury. In all doubtful cases, the latter course should be adopted. But this was not a doubtful case. If the company proceeded on the plan proposed,-it was perfectly evident they would, to some extent, interfere with the navigation ; and this they hardly deny. They insist that the charter gave them full power to do all they proposed, and then “ deny that the construction of the piers as proposed, will obstruct or injure the navigation of the said river in a material manner, or that it will at all prevent the free and uninterrupted navigation of •said river, with ordinary care.” The issue made is, that the piers were proposed to be built as the charter authorized, and would not prevent the free and uninterrupted navigation to any greater extent than was intended by it; and not that, independent of the charter, they would not so hinder and obstruct the navigation as to constitute a nuisance. Upon the latter point, the casé was too plain to admit of a reasonable doubt, and there was, therefore, no necessity for a trial by jury. The real question at issue between the parties was, as to the meaning of the charter, and this the Chancellor decided quite as favorably for the company as a sound construction of it warranted.
It is next objected that the decree made in 1852, and the final decree consequent thereon, are erroneous in adjudging the defendants to be in contempt. The first decree enjoined them from constructing their works in and upon the river, upon the plan in the bill and answer mentioned, or in the *791 manner in said answer sot forth, and also from extending their piers or wharves into the river, beyond points on each side thereof, which may be reached by ferry-boats of suitable dimensions at low water; and then proceeds to declare, “ that the Chancellor not having before him sufficient information to give any more specific direction as to the manner in which the wharves, piers and other works of said company in said river shall be constructed, it is necessarily for the present left to the judgment of the said company, subject to the provisions of their charter, and the directions contained in this order, and the action of the proper authorities, if the provisions of said charter shall be violated.”
The Chief Justice decided that the order and injunction of the court had been violated in this, that the defendants had not refrained from extending their piers or wharves into the river, beyond points on each side thereof which may be reached by ferry-boats of the company of suitable dimensions, at low water. Now it is-plain, I think, that after the decree ordering an injunction, the defendants did not extend their piers farther than they were when the decree was made. They were not enjoined to remove them, and the Chancellor left for future decision, upon facts afterwards to appear, the precise manner in which they should be constructed so as to conform to his construction of the charter. The facts were afterwards ascertained, and the precise manner in which the works ought to be made accurately ascertained, and then it appeared, and I think the Chief Justice rightly decided, that the piers and wharves were extended beyond what was necessary for the ferry. The final decree, therefore, ordering them to abate the nuisance, was correct, but, in my opinion, the defendants were guilty of no contempt. It was not shown that they had wilfully or wantonly violated the Chancellor’s directions. He left the mode of proceeding to their judgment, and if they erred in carrying out his instructions, and he was right in giving them, they proceeded so far at their peril, as to render their works liable to be abated; but an error of judgment in a matter very far from being apparent when they acted, was not such a viola *792 tion of an explicit order as ought to subject them to an attachment.
As to the further objection insisted on, that the final decree was erroneous because it was founded on the report of two special masters who were not sworn, I think the Chief Justice gave the proper answer to it. . If it be admitted that the report was informal, which I am not disposed to think is true, the facts now before the court, contained in the testimony of the witnesses taken before one of the regular masters, sufficiently sustains the decree, independently of the report itself, and it ought, therefore, to be affirmed.
Upon the whole, I am of opinion that the decree, so far as it orders an attachment against the defendants, should be reversed, without costs of the appeal; and that in all other respects the decree should be affirmed, with costs.
Decree affirmed unanimously.
Cited in Terhune v. Colton, 1 Beas. 318; Allen v. Board of Chosen Freeholders, 2 Beas. 74; Stevens v. Pat. & Newark R. R. Co., 5 C. E. Gr. 133; Penna. R. R. v. N. Y. & Long Branch R. R., 8 C. E. Gr. 160.